505 A.2d 973

Linda BURNSIDE and Spencer Burnside, her husband; Donna Giordano and Miron J. Giordano, her husband; Carol Janoss, an individual; Ann S. Lynch and Michael P. Lynch, her husband; Nancy Stark and Richard Stark, her husband, Appellants,

v.

ABBOTT LABORATORIES, a corporation; Adria Laboratories, Inc., a subsidiary of Hercules, Inc.; Alcon Laboratories, Inc., a corporation; Amfre-Grant, Inc., a subsidiary of Ormont Drug and Chemical, a corporation; Armour Pharmaceutical Co., a subsidiary of Revlon, Inc.; Breon Laboratories, Inc., a subsidiary of Sterling Drug, Inc., a corporation; Burroughs Wellcome Company, a subsidiary of the Wellcome Foundation, Inc., a corporation; C.D. Smith Drug Company, a corporation; Carnrick Laboratories, a division of G.W. Carnrick Company, a corporation: Chemetron Corporation, a corporation; Cole Pharmacal Company, Inc., a subsidiary of O'Neal, Jones & Feldman, Inc., a corporation; Dorsey Laboratories, a division of Sandoz, Inc., a corporation; Drug Products Company, Inc., a corporation; E.R. Squibb & Sons, Inc., a subsidiary of Squibb Corporation, a corporation; Eli Lilly & Co., a corporation; Kremers-Urban Company; Merck & Company, Inc., a corporation; Merck, Sharp & Dohme, a division of Merck and Company, a corporation; Merrell-Dow Pharmaceuticals, a division of Richardson-Merrell, a corporation; Miller Pharmacal Group; National Drug Company, a division of Richardson-Merrell, Inc., a corporation; Physicians Drug & Supply Company, a corporation; Physicians & Hospitals Supply Company, a corporation; Premo Pharmaceutical Laboratories, Inc., a corporation; Revlon, Inc., a corporation; Rexall Drug Company, a corporation; Richardson-Merrell, Inc., a corporation; Rowell Laboratories, Inc., a corporation; Sandoz, Inc., a corporation; Smith-Dorsey Sterling Drug Company, Inc., a corporation; Squibb Corporation, a corporation; Ulmer Pharmacal Company, a division of Physicians & Hospitals Supply Company, a corporation; Upjohn Company, a corporation; Vale Chemical Company; Vitamins, Inc., a corporation; Wander Company, a corporation; Warren-Teed Pharmaceuticals, Inc., a subsidiary of Rohm and Haas Co., a corporation; Webcon Pharmaceuticals Company, a subsidiary of Alcon Laboratories, a corporation; William H. Rorer, Inc., a corporation; William S. Merrell Company, a division of Richardson-Merrell, Inc., a corporation.

**Appeal of Linda BURNSIDE and Spencer Burnside, Donna Giordano and Miron J. Giordano, Carol Janoss, Nancy Stark and Richard Stark, and Ann S. Lynch and Michael P. Lynch.**

Superior Court of Pennsylvania.

Argued May 13, 1985.

Filed Dec. 20, 1985.

Reargument Denied Feb. 28, 1986.

268

John T. Tierney, III, Pittsburgh, for appellants.

Frederick N. Egler, Pittsburgh, for Abbott, appellee.

Richard DiSalle, Pittsburgh, for Merck, appellee.

Kerry A. Kearney, Pittsburgh, for all appellees.

Before ROWLEY, WIEAND and DEL SOLE, JJ.

WIEAND, Judge:

In this action stating five separate claims for injuries allegedly sustained by five women against all pharmaceutical companies who allegedly manufactured diethylstilbestrol (DES), in which the women alleged that the drug had been ingested by their mothers (only one alleged that she had ingested the drug herself), the trial court granted complete or partial summary judgments in favor of twenty-six named defendants whose products could not have caused the injuries sustained by the plaintiffs designated in the defendants' respective motions for summary judgment. In an appeal from these summary judgments, the plaintiff-appellants do not dispute that the defendant-appellees' products could not have been ingested by them or their mothers, but they contend that there should be industry-wide liability for injuries caused by the ingestion of DES. We reject this

argument and affirm the trial court's order entering summary judgment.

In separate actions against seventy-two pharmaceutical companies, four women alleged various physical disabilities which they attributed to the ingestion of DES by their mothers during pregnancies in the 1950's. Another woman's cause of action, i.e., that of Mrs. Stark, was based upon her own ingestion of DES. DES is a synthetic estrogen first synthesized in 1937 and frequently prescribed by physicians for various purposes, including deterrence of miscarriages. The complaints in this case did not contain averments regarding the identity of the manufacturer whose product had been ingested by the respective users. Plaintiffs concede that they cannot do so. Instead, their complaints contained averments that the defendant pharmaceutical companies were jointly and/or severally liable because, at the time of ingesting the drug, DES was being marketed in generic form.

On June 22, 1982, pursuant to an uncontested motion by Eli Lilly and Company, one of the defendants, the trial court issued an order relating to organization of the defendants and discovery. The order called for a "first stage" of discovery to end June 30, 1983. It said:

> The Court recognizes that this is a complicated action which will require a considerable amount of discovery. The Court also recognizes that time and expense to all parties will be minimized if the first stage of such discovery is *limited to the determination of which defendants are proper parties to this action. After a determination of the identity of the product ingested by the mothers of plaintiff daughters, some defendants may wish to file motions for relief by way of dismissal, summary judgment or otherwise....*

(emphasis added). The court ordered further that first stage discovery should consist of depositions, interrogatories and requests for admissions of those *who may aid in the determination of the proper parties to the action.* Plaintiffs were given until September 1, 1982 to effectuate

service on all defendants. During the course of first stage discovery, thirty-two of the original seventy-two defendants were dismissed without objection by the plaintiffs. Seventeen defendants were dismissed because appellants had failed to serve them. Fifteen others were dismissed because each had demonstrated that its products could not have been ingested by *any* of the alleged users. As of July, 1983, therefore, only forty of the original seventy-two defendants remained as party defendants.

Twenty-six of the forty remaining defendants thereafter filed motions for summary judgment. Each of these defendants argued that discovery proceedings had revealed that the plaintiffs named in its motion for summary judgment could not have been exposed to and injured by its product. The trial court, by orders dated April 11, 1984 and April 13, 1984, granted partial or complete summary judgment in favor of the moving defendants as follows:

1) In favor of
 Rexall Drug Company
 Ulmer Pharmacal Company
 Sandoz, Inc.
 Dorsey Laboratories
 The Wander Company
 Smith-Dorsey Sterling Drug Company
 Adria Laboratories
 against all plaintiffs. (Appeal docketed at No. 590 Pittsburgh, 1984).
2) In favor of
 Burroughs Wellcome Company
 Premo Pharmaceutical Laboratories, Inc.
 William Rorer, Inc.
 Abbott Laboratories
 Upjohn Company
 Kremers-Urban Company
 Armour Pharmaceutical Co.
 Revlon, Inc.
 Carnrich Laboratories

Cole Pharmacal Company
Amfre-Grant, Inc.
Merck & Company
Merck, Sharp & Dohme
and against Donna and Miron Giordano and Nancy and
Richard Stark. (Appeal docketed at No. 591 Pitts-
burgh, 1984).

3) In favor of
Merrell-Dow Pharmaceuticals
Richardson-Merrell, Inc.
William S. Merrell Company
The National Drug Company·
Burroughs Wellcome Company
Armour Pharmaceutical Co.
Revlon, Inc.
and against Linda and Spencer Burnside and Carol
Janoss. (Appeal docketed at No. 592 Pittsburgh, 1984).

4) In favor of
Physicians and Hospitals Supply Company
against all plaintiffs (Appeal docketed at No. 593 Pitts-
burgh, 1984).

5) In favor of
Warren-Teed Pharmaceuticals, Inc.
against all plaintiffs (Appeal docketed at No. 589 Pitts-
burgh, 1984).

The Court also entered summary judgment against Ann and
Michael Lynch in favor of twenty-eight of the forty named
defendants on the ground that the Lynchs' action was
barred by the statute of limitations.

## I.

The trial court explained that summary judgments had
been granted because undisputed affidavits, together with
other discovery documents, had shown that the companies
excused from the action could not have manufactured the
DES causally ingested. Appellants do not dispute the facts
on which the trial court based its orders. Their sole conten-
tion on appeal is that summary judgment was improper

because of their averments of industry-wide liability. The three theories advanced to support industry-wide liability may be summarized as follows:

(1) Civil Conspiracy;

(2) Concerted Action under Section 876 of the Restatement (Second) of Torts; and

(3) Enterprise Liability.[1]

The trial court rejected these theories because appellants had not alleged facts sufficient to support causes of action. The court further determined that such theories would be of no avail to appellants because the manufacturers in whose favor summary judgment was being entered could not have caused appellants' injuries. Appellants, although conceding that the products of these manufacturers did not directly cause the injuries of which they complain, argue nevertheless that industry-wide liability is a viable theory of recovery.

It is by now axiomatic that a motion for summary judgment may only be granted where there is no genuine issue

---

**1.** Appellants also argued to the trial court that summary judgment should not have been granted because issues of fact remained as to appellees' liability under Section 433B(3) of the Restatement (Second) of Torts. However, appellants have abandoned this argument on appeal and rely exclusively upon the other three theories of liability.

The theory of alternative liability nevertheless would not have benefitted the plaintiffs under the facts of this case. Although one Pennsylvania court has accepted the theory of alternative liability in a DES case, it indicated that such liability cannot attach where the defendant-manufacturers have exculpated themselves. See: *Erlich v. Abbott Laboratories,* 5 Phila. 249, 255 (1981). In *Erlich,* several defendants were dismissed from the action because they demonstrated either (1) that they could not have manufactured the DES ingested by the plaintiff's mother; or (2) that they did not market DES in Pennsylvania; or (3) that they did not market it until after the relevant time period; or (4) that they did not market DES at all, even though licensed to do so, or (5) that they did not market it in the form of a small white pill in the dosage prescribed for the plaintiff's mother. *Id.* Instantly, each of the defendants in whose favor summary judgment has been granted has demonstrated one or more of the exculpatory factors delineated in *Erlich.* Thus, even if the plaintiffs continued to assert the theory of alternative liability, it would not be available to them here. Accord: *Ferrigno v. Eli Lilly & Co.,* 175 N.J.Super. 551, 571, 420 A.2d 1305, 1316 (1980).

of material fact and the moving party is entitled to a judgment as a matter of law. 6 Std.Pa.Prac.2d § 32.40 (1982) and cases cited therein. On a motion for summary judgment, the court should not attempt to resolve conflicting contentions of fact or conflicting inferences that may be drawn from the facts. *Id.* § 32.44 and cases cited therein. The party moving for summary judgment has the burden of establishing that no genuine issues of material fact exist. *Id.* § 32.43 and cases cited therein. All doubts must be resolved against the granting of the motion. *Id.* Summary judgment may only be granted in the clearest of cases, i.e., where there is not the slightest doubt concerning the absence of a triable issue of material fact. *Id.* § 32.40 and cases cited therein.

An essential element of any cause of action in tort is that there must be some reasonable connection between the act or omission of the defendant and the injury suffered by the plaintiff. Prosser and Keeton, *Torts* § 41, at 262 (5th ed. 1984); Annot., *"Products Liability: Necessity and Sufficiency of Identification of Defendant as Manufacturer or Seller of Products Alleged to Have Caused Injury"*, 51 A.L.R.3d 1344, 1349 (1973). Negligent conduct is not a ground for recovery unless it is a substantial factor in bringing about the plaintiff's injury. *Hamil v. Bashline*, 481 Pa. 256, 265, 392 A.2d 1280, 1284 (1978); *Heck v. Beryllium*, 424 Pa. 140, 144, 226 A.2d 87, 90 (1966); *Cuthbert v. City of Philadelphia*, 417 Pa. 610, 614, 209 A.2d 261, 263 (1965); *Harrison v. City of Pittsburgh*, 353 Pa. 22, 24, 44 A.2d 273, 275 (1945); *Ostrowski v. Crawford Door Sales Co. of Scranton, Pa.*, 207 Pa.Super. 424, 431, 217 A.2d 758, 762 (1966).

A majority of those courts which have considered DES claims have held that a cause of action does not exist unless the plaintiff can identify the manufacturer of the pills which caused injury. *Martin v. Abbott Laboratories*, 102 Wash.2d 581, 590, 689 P.2d 368, 375 (1984). See, e.g., *Morton v. Abbott Laboratories*, 538 F.Supp. 593 (M.D.Fla. 1982); *Pipon v. Burroughs-Wellcome Co.*, 532 F.Supp. 637

(D.N.J.1982), *aff'd,* 696 F.2d 984 (3d Cir.1982); *Tidler v. Eli Lilly & Co.,* 95 F.R.D. 332 (D.D.C.1982); *Mizell v. Eli Lilly & Co.,* 526 F.Supp. 589 (D.S.C.1981); *Ryan v. Eli Lilly & Co.,* 514 F.Supp. 1004 (D.S.C.1981); *Gray v. United States,* 445 F.Supp. 337 (S.D.Tex.1978); *Payton v. Abbott Laboratories,* 386 Mass. 540, 437 N.E.2d 171 (1982); *Namm v. Charles E. Frosst & Co.,* 178 N.J.Super. 19, 427 A.2d 1121 (1981). Cf. *Cummins v. Firestone Tire & Rubber Co.,* 344 Pa.Super. 9, 495 A.2d 963 (1985) (plaintiff, who could not identify the particular manufacturer of tire and rim assembly that caused him injury, could not maintain a negligence action against one of several such manufacturers). Nevertheless, DES plaintiffs have continued to suggest possible theories, including the three asserted by appellants in this case, in an effort to circumvent the need to identify the manufacturer responsible for causing injury. *Martin v. Abbott Laboratories, supra* 102 Wash.2d at 590, 689 P.2d at 375. See: Note, *Market Share Liability: An Answer to the DES Causation Problem,* 94 Harv.L.Rev. 668, 670–672 (1981) [hereinafter cited as Note, *Market Share Liability*]. In the instant case, therefore, we must determine whether the appellants have alleged sufficient facts to support the theories which they advance; and if so, whether their proposed theories are sufficient to overcome the threshold burden of establishing causation in fact. See: *Ryan v. Eli Lilly & Co., supra* at 1007.

■ The gravamen of the plaintiffs' arguments under each theory of industry-wide liability is that the "[d]efendants are individually and/or jointly liable to Plaintiffs for their failure to exercise due care and reasonable care in marketing and promoting DES *to prevent miscarriages between 1947 and 1971* without warnings of its experimental nature, without testing, when Defendant knew or should have known of its harmful effects." Appellants' Complaint, Paragraph 31 (emphasis added). Several of the defendants, however, clearly exculpated themselves from appellants' basic contention. The following pharmaceutical companies have shown that they did not at any relevant time market

DES for the purpose of preventing miscarriages: Merrell Dow Pharmaceuticals, Richardson-Merrell, Inc., William S. Merrell Co., National Drug Co., Burroughs-Wellcome Co., Armour Pharmaceutical Co., Revlon, Inc., Sandoz, Inc., Dorsey Laboratories, Wander Co., Smith-Dorsey Drug Co.[2] Moreover, Cole Pharmacal, Inc. has demonstrated that it ceased production of DES in 1954, four years prior to ingestion of the drug by Nancy Stark and, consequently, four years prior to any possible exposure of Mrs. Stark's daughter, Donna Giordano, to the drug. Similarly, Warren-Teed Pharmaceuticals, Inc. and Adria Laboratories, Inc. have established that they both were formed as corporations long after any of the plaintiffs' mothers had used DES, and that they in fact never manufactured DES.[3] The plaintiff-appellants, in their brief, do not contest these assertions. Because these defendants have shown that they were not engaged in the manufacture, promotion, or marketing of DES as a miscarriage preventative during the relevant time period, these drug companies do not fall within the plaintiffs' description of the "industry" which allegedly caused the injuries of which they complain. These defendants, therefore, cannot be held liable to those claimants against whom judgment was entered under any proposed theory of industry-wide liability. See: *Miles Laboratories v. Superior Court*, 133 Cal.App.3d 587, 184 Cal.Rptr. 98 (1982) (court's majority opinion agreed with the dissent that liability should not be imposed on DES manufacturer that did not produce DES as a miscarriage preventative, unless the drug company knew that its DES was being so used). See also: *Sindell v. Abbott Laboratories*, 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132, *cert. denied*, 449 U.S. 912, 101 S.Ct. 285, 66 L.Ed.2d 140 (1980) (court refused to recognize theory of concerted action in DES case where it "would render virtually any manufacturer liable for the

**2.** For reasons not here relevant, the trial court did not enter summary judgments relieving all such manufacturers from the claims of all plaintiffs. See court order appearing at pp. 270 and 272, *supra*.

**3.** We discuss in Part II of this opinion the appellants' assertion that Warren-Teed Pharmaceuticals is liable as a successor corporation.

defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by defendant"). The order granting summary judgment in favor of these named defendants, therefore, will be affirmed.

 A complaint must, at a minimum, set forth the facts upon which a cause of action is based. *Cianfrani v. Commonwealth,* 505 Pa. 294, 304 n. 5, 479 A.2d 468, 473 n. 5 (1984). However, it is not necessary that a plaintiff identify the specific legal theory underlying the complaint. *Weiss v. Equibank,* 313 Pa.Super. 446, 453, 460 A.2d 271, 275 (1983). It is the duty of the court to discover from the facts alleged in a complaint the cause of action, if any, stated therein. *Bartanus v. Lis,* 332 Pa.Super. 48, 57, 480 A.2d 1178, 1182 (1984). A complaint must not only give notice to the defendant of the claim being asserted but it must summarize the facts essential to support the claim. *Cianfrani v. Commonwealth, supra* 505 Pa. at 304 n. 5, 479 A.2d at 473 n. 5; *Alpha Tau Omega Fraternity v. University of Pennsylvania,* 318 Pa.Super. 293, 298, 464 A.2d 1349, 1352 (1983); *Weiss v. Equibank, supra* 313 Pa.Super. at 453, 460 A.2d at 274–275. A plaintiff cannot escape this duty by a general averment that the facts are in the possession of the defendant. 2 Goodrich-Amram 2d § 1019:1 (1976).

Examination of the complaints and discovery proceedings now before this Court fails to disclose facts sufficient to sustain causes of action based upon (1) an industry-wide conspiracy; (2) concerted industry action; or (3) enterprise liability. We will examine more closely each of these theories advanced on appeal by the plaintiff-appellants.

## A. *Civil Conspiracy*

 To state a cause of action for civil conspiracy under Pennsylvania law, a complaint must allege the existence of all elements necessary to such a cause of action. *Baker v. Rangos,* 229 Pa.Super. 333, 351, 324 A.2d 498, 506 (1974). A cause of action for conspiracy requires that two or more persons combine or enter an agreement to commit an un-

lawful act or to do an otherwise lawful act by unlawful means. *Slaybaugh v. Newman,* 330 Pa.Super. 216, 221, 479 A.2d 517, 519 (1984). Proof of malice is an essential part of a cause of action for conspiracy. *Thompson Coal Co. v. Pike Coal Co.,* 488 Pa. 198, 211, 412 A.2d 466, 472 (1979). "The mere fact that two or more persons, each with the right to do a thing, happen to do that thing at the same time is not by itself an actionable conspiracy." *Id.,* 488 Pa. at 212, 412 A.2d at 473, citing *Fife v. Great Atlantic and Pacific Tea Co.,* 356 Pa. 265, 267, 52 A.2d 24, 39 (1947); *Morris v. Halford,* 352 Pa. 138, 42. A.2d 411 (1945).

Our research discloses two DES cases in which the theory of civil conspiracy was alleged. See: *Ryan v. Eli Lilly & Co., supra; Collins v. Eli Lilly & Co.,* 116 Wis.2d 166, 342 N.W.2d 37 (1984), *cert. denied sub nom., E.R. Squibb & Sons, Inc. v. Collins,* — U.S. —, 105 S.Ct. 107, 83 L.Ed.2d 51 (1984). It was rejected in both cases.

Applying the law of South Carolina, which is similar to the law in Pennsylvania, the United States District Court in *Ryan v. Eli Lilly & Co., supra,* held that in order to state and prove a cause of action for civil conspiracy, the plaintiffs were required to allege and prove that the defendant had entered into an unlawful agreement for the express purpose of committing either a criminal act or an intentional tort. Negligence, the court held, was insufficient. After reviewing the elements of civil conspiracy under South Carolina law, the court concluded that the plaintiff, as a matter of law, could not make out a cause of action for civil conspiracy.

> Plaintiff has shown no meetings, no conferences, no telephone calls, no joint filings, no cooperation, no consolidation, no licensing—nothing that any two companies did together. Each company had its own distinct FDA filings, package literature, warnings, indications, manufacturing processes, trade names, and marketing practices. Here, as in *Sindell v. Abbott Laboratories,* 26 Cal.3d 588, 607 P.2d 924, 163 Cal.Rptr. 132 (1980), no evidence supports plaintiff's allegations of common efforts or concert-

ed, conspiratorial action. In fact, all of the evidence proves that no defendant entered into any agreement or even cooperated with any other drug company in the licensing, manufacturing, marketing, or promotion of Stilbestrol [DES] for the use that plaintiff claims produced her injuries. On this state of the facts, summary judgment shall be entered, dismissing plaintiff's conspiracy claims.

*Id.* at 1014.

Similarly, the Supreme Court of Wisconsin held that conspiracy allegations of a DES daughter in *Collins v. Eli Lilly & Co., supra,* were inadequate to state a cause of action where the plaintiff had asserted "that the defendant drug companies formed and operated a conspiracy to gain FDA approval of DES in 1941 and carried the conspiracy into seeking FDA approval in 1947 and 1948 for use of DES in problem pregnancies." *Id.* at 187, 342 N.W.2d at 47. The plaintiff had alleged further that "the drug companies used the fruits of their conspiracy, i.e., FDA approval to produce and market DES for pregnancy, to misrepresent to the public at large, including the plaintiff's mother, that DES was safe and efficacious." *Id.* The Wisconsin court observed that although the plaintiff had pleaded parallel conduct by drug companies in 1941, such behavior alone was insufficient to establish a conspiracy. *Id.* at 188, 342 N.W.2d at 48. There was no averment that defendants had "either explicitly or tacitly collaborated to gain FDA approval so that they could in turn collaborate to misrepresent the safety and efficacy of DES for use in preventing miscarriages." *Id.* The court rejected the argument of civil conspiracy, observing that many drug companies had entered the DES market long after FDA approval and should not be charged with participation in and knowledge of prior activity by pharmaceutical companies. *Id.*

Both *Ryan* and *Collins* are apposite to the instant case. The plaintiffs, in their complaint, alleged the following facts:

*Twenty-ninth:* From 1947 through 1941 [sic] each of the Defendants, individually and in concert with each other, manufactured and marketed DES under various names but in an identical, generic formula, sold to the public, as a prescription drug to prevent miscarriages. Although defendants knew or should have known of the potential carcinogenic effects of DES, and its experimental status as a preventative for miscarriage, Defendants manufactured and marketed it without testing for teratogenic and carcinogenic effects; without warning for such potential effects, and without notice of the Food and Drug Administration's approval for only experimental use in prevention of miscarriage.

The defendants conduct, they alleged, was "wrongful, reckless, careless, negligent and grossly negligent." Appellants' Complaint, Paragraph 32. The plaintiffs, however, have failed to aver those facts which are necessary to state a cause of action for conspiracy.

■ Like the DES daughters in *Ryan* and *Collins*, the plaintiffs in the instant case have failed to allege the manner in which a conspiratorial scheme was devised and carried out. The complaint contains no averments of meetings, conferences, telephone calls, joint filings, cooperation, consolidation, or joint licensing. The plaintiffs have alleged no more than a contemporaneous and negligent failure to act. This was insufficient to state either a conspiratorial agreement or the requisite intent to cause injury. Similarly, the completed discovery fails to demonstrate facts necessary to a cause of action for conspiracy. The trial court correctly held, therefore, that the appellees were not liable to the plaintiffs on a theory of civil conspiracy.

## B. *Concerted Action*

The theory of concerted action is to be found in § 876 of the Restatement (Second) of Torts. That Section provides as follows:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he

(a) does a tortious act in concert with the other or pursuant to a common design with him, or

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

A cause of action for concerted activity under Section 876 of the Restatement (Second) of Torts has been recognized only recently by the courts in Pennsylvania. In *Kline v. Ball*, 306 Pa.Super. 284, 452 A.2d 727 (1982), a panel of this Court observed that in some situations Section 876 "might well prove applicable." *Id.*, 306 Pa.Superior Ct. at 287, 452' A.2d at 728. The Court held, however, that Section 876 did not apply to the facts of that case. The plaintiff in *Kline* had been injured when struck by a falling trash can which had been pushed from a school balcony by one of a group of boys. The plaintiff attempted to place liability also on the bystanders. However, he could not show that any one party or all of the bystanders had participated in encouraging the act. The Court refused to validate the plaintiff's concerted action theory because the plaintiff had been unable to establish who among the bystanders had initiated the prank. The Court stated:

> Tort liability must be founded upon some blameworthy conduct, or lack of due care resulting in the violation of a duty owing to others.
>
> . . . . .
>
> In Pennsylvania, the principle of liability without fault for injuries to the person has received scant consideration. The great body of our law of liability for personal injuries is that of liability through fault; liability based almost exclusively on wrongful conduct. *Summit Hotel Co. v. National Broadcasting Co.*, 336 Pa. 182, 8 A.2d 302, 305 (1939).

*Kline v. Ball, supra* 306 Pa.Super. at 287–288, 452 A.2d at 729. *Kline* holds that a cause of action for concerted action cannot be established in Pennsylvania if the plaintiff is unable to identify the person who acted in concert with the wrongdoer or who gave him assistance or encouragement.

A similar result was obtained in a products liability dispute in *Cummins v. Firestone Tire & Rubber Co., supra.* The plaintiff in *Cummins* alleged that he had been injured when a multipiece tire and rim assembly exploded as it was being inflated. However, he was not able to identify either the offending product or the manufacturer of the tire and rim assembly which had caused his injury. He argued that a cause of action for concerted activity could be maintained against any manufacturer without regard to direct identification of that particular defendant as the manufacturer of the injury-producing product. The Court said:

Appellant's assertion cannot prevail. In order for this cause of action to be viable, there must be acts of a tortious character pursuant to a common design or plan. RESTATEMENT (SECOND) OF TORTS § 876 comment (b) (1977). In the alternative, a defendant must render substantial assistance to another to accomplish a tortious act. As specifically stated in comment (d) to § 876(b), "in determining liability, the factors are the same as those used in determining the existence of legal causation when there has been negligence...."

As seen above, appellant cannot establish a prima facie case of negligence against appellee Budd. Moreover, he has failed to aver that Budd has rendered substantial assistance to those manufacturers who have allegedly engaged in concerted tortious conduct.

Finally, this cause of action has not heretofore been recognized in this Commonwealth as a valid basis for imposing liability. In light of appellant's failure to establish the requisite elements of this count, this case is an improper vehicle for the initial consideration of this cause of action by a court of this Commonwealth. To sustain a concert of action theory in the instant case would render

any manufacturer in Pennsylvania liable to any member of the public for the defects of his competitor's products. Such a result is unconscionable.

*Id.*, 344 Pa.Superior Ct. at 21–22, 495 A.2d at 969–970.

■ The concern that a manufacturer would become liable for defects in his competitor's products is shared by an overwhelming majority of jurisdictions which have considered the concerted action theory. These courts have uniformly refused to apply the theory in DES cases. See, e.g., *Morton v. Abbott Laboratories, supra; Ryan v. Eli Lilly & Co., supra; Payton v. Abbott Laboratories*, 512 F.Supp. 1031 (1981); *Sindell v. Abbott Laboratories, supra; Conley v. Boyle Drug Co.*, 477 So.2d 600 (Fla.Dist.Ct. App., 1985); *Namm v. Charles E. Frosst & Co., supra; Ferrigno v. Eli Lilly & Co.*, 175 N.J.Super. 551, 420 A.2d 1305 (1980); *Martin v. Abbott Laboratories, supra; Collins v. Eli Lilly & Co., supra.* Contra: *Abel v. Eli Lilly & Co.*, 418 Mich. 311, 343 N.W.2d 164 (1984), *cert. denied sub nom., E.R. Squibb & Sons, Inc. v. Abel*, —— U.S. ——, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984); and *Bichler v. Eli Lilly & Co.*, 55 N.Y.2d 571, 436 N.E.2d 182, 450 N.Y.S.2d 776 (1982). We elect to follow the majority. In doing so, we adopt the reasoning set forth in *Sindell v. Abbott Laboratories, supra*, which is in harmony with Pennsylvania policies articulated in *Cummins* and *Kline.*

> The gravamen of the charge of concert is that defendants failed to adequately test the drug or to give sufficient warning of its dangers and that they relied upon the tests performed by one another and took advantage of each other's promotional and marketing techniques. These allegations do not amount to a charge that there was a tacit understanding or a common plan among defendants to fail to conduct adequate tests or give sufficient warnings, and that they substantially aided and encouraged one another in these omissions.
>
> . . . .
>
> What the complaint appears to charge is defendants' parallel or imitative conduct in that they relied upon each

other's testing and promotion methods. But such conduct describes a common practice in industry: a producer avails himself of the experiences and methods of others making the same or similar products. *Application of the concept of concert of action to the situation would expand the doctrine far beyond its intended scope and would render virtually any manufacturer liable for the defective products of an entire industry, even if it could be demonstrated that the product which caused the injury was not made by the defendant.*

*Sindell v. Abbott Laboratories, supra* 26 Cal.3d at 605, 607 P.2d at 932–933, 163 Cal.Rptr. at 141. To allow the plaintiffs to proceed on such a cause of action on the facts here shown would produce the inequitable result of exposing to liability those manufacturers who have already demonstrated that their products were not the cause of the plaintiffs' injuries. We conclude, therefore, that the law of this Commonwealth forecloses the assertion of a cause of action for concerted action where the plaintiff is unable to isolate a particular manufacturer as a causative agent of his injuries.

■■■ The plaintiffs in this case, as in *Sindell*, rely upon averments that the defendant manufacturers failed to test DES adequately and failed to give adequate warning of the risks inherent in its use as a miscarriage deterrent. Plaintiffs have not alleged either a tacit understanding or common design to market a defective product or that appellees rendered substantial assistance in causing injury to the plaintiffs. They have charged the defendants merely with "parallel and imitative" conduct. Moreover, the completed discovery does not support a cause of action for concerted activity. To sustain a cause of action for concerted tortious conduct under these circumstances would be to expand the doctrine of Section 876 of the Restatement beyond its intended scope and would render each manufacturer liable for the defective products of an entire industry even where it was shown that the product causing the injury had not been made or marketed by the defendant.

## C. *Enterprise Liability*

■ Enterprise liability exists where (1) the injury-causing product was manufactured by one of a *small* number of defendants in an industry; (2) the defendants had joint knowledge of the risks inherent in the product and possessed a joint capacity to reduce those risks; and (3) each of them failed to take steps to reduce the risk but, rather, delegated this responsibility to a trade association. This concept was articulated in *Hall v. E.I. DuPont De Nemours Co.*, 345 F.Supp. 353 (E.D.N.Y.1972). See also: *Conley v. Boyle Drug Co., supra.* In *Hall,* the plaintiffs were thirteen children who had sustained injuries in separate incidents as a result of exploding blasting caps. Although they could not identify the particular manufacturers responsible for their individual injuries, the plaintiffs commenced an action against six blasting cap producers which comprised virtually the entire industry in the United States. There was evidence that these defendants had adhered to an industry-wide standard regarding safety features of blasting caps, and that they had delegated the responsibility for investigating safer product designs to their trade association. The court concluded that under these limited facts, the plaintiffs had sufficiently stated a cause of action. The defendants' joint knowledge of the risks inherent in their product and a shared capacity to reduce those risks imposed upon them a duty to act, for the failure of which they could be made liable. The court cautioned: "[w]hat would be fair and feasible with regard to an industry of five or ten producers might be manifestly unreasonable if applied to a decentralized industry composed of thousands of small producers." *Id.* at 378.

■ For this very reason the theory of enterprise liability has uniformly been rejected by courts considering DES related injuries. See, e.g., *Morton v. Abbott Laboratories, supra; Ryan v. Eli Lilly & Co., supra; Sindell v. Abbott Laboratories, supra; Conley v. Boyle Drug Co., supra; Namm v. Charles E. Frosst & Co., supra; Martin v. Abbott Laboratories, supra; Collins v. Eli Lilly & Co.,*

*supra.* There are significant differences between the facts in *Hall* and the facts in the DES cases. Those differences support the uniform rejection of enterprise liability in the latter cases. As the court in *Sindell* observed, there is a great disparity between the number of manufacturers involved in *Hall* and the number of DES producers. See: *Sindell v. Abbott Laboratories,* 26 Cal.3d *supra* at 608, 607 P.2d at 935, 163 Cal.Rptr. at 143. There were only six blasting cap manufacturers in *Hall;* whereas, the total number of DES manufacturers was over two hundred. Furthermore, the joint control of the risk in *Hall* was based upon the blasting cap manufacturers' delegation of safety responsibilities to a trade association. This fact is absent in the DES scenario. Finally, while the government was involved in regulating the testing and marketing of DES, the safety designs of the blasting caps in *Hall* were controlled by self-imposed, industry-wide standards. We agree with the court in *Sindell* that it would be unfair to impose upon a manufacturer liability for injuries resulting from the use of a drug which it did not produce merely because the enterprise followed governmentally influenced standards of an industry. See: *Sindell v. Abbott Laboratories, supra* at 608, 607 P.2d at 935, 163 Cal.Rptr. at 143.

Our rejection of the enterprise liability concept is consistent with the law of Pennsylvania. In *Cummins v. Firestone Tire & Rubber Co., supra,* the court affirmed an order sustaining preliminary objections to a complaint which had purported to aver a theory of enterprise liability based on a bald averment that members of the tire and rim assembly industry had collaborated in the "intentional manufacture, promotion and distribution of a generically similar defective device with the knowledge that a safer device was available." *Id.* 344 Pa.Super. at 23, 495 A.2d at 970. As in the instant case, the plaintiff in *Cummins* failed to establish that the named defendants constituted virtually the entire tire and rim assembly industry, and that the defendants had delegated safety functions to a trade association. *Id.* In addition to finding the complaint insufficient, the

Court observed that "this cause of action has heretofore not been recognized by the courts of this Commonwealth as affording a basis for relief to an aggrieved plaintiff, and will not now be so adopted." *Id.*, 344 Pa.Superior Ct. at 24, 495 A.2d at 971. We, similarly, find no compelling reason to apply such a theory to sustain an industry-wide cause of action in response to the facts alleged by these plaintiffs. The averments of the complaints do not suggest that the pharmaceutical defendants possessed a joint capacity for reducing the risks inherent in DES. The plaintiffs also did not allege that the defendant drug companies had avoided their responsibility to reduce the dangers of DES by contemporaneously delegating this burden to a trade association. See: *Cummins v. Firestone Tire & Rubber Co.*, *supra*, 344 Pa.Superior Ct. at 22, 495 A.2d at 970. Finally, the plaintiffs did not allege or show, and indeed cannot allege or show, that the forty drug companies named as defendants constituted substantially the entire industry which had produced DES as a miscarriage preventative in the 1950s. *Id.* See also: Note, *Market Share Liability*, *supra* at 670, n. 13. The complaint, in short, does not state a legally cognizable cause of action for enterprise liability.

### D. *Market Share Alternate Liability*

After the trial court had entered the summary judgments from which the instant appeals were taken, the Supreme Court of Washington articulated a completely new concept for allowing recovery in DES cases. See: *Martin v. Abbott Laboratories, supra.* This theory has not been adopted by the courts of Pennsylvania. We consider it here to determine whether the facts in this case would support such a cause of action. Because the facts alleged and shown during discovery are insufficient to sustain a cause of action as stated by the Washington court, we find it unnecessary to decide whether such a theory should be adopted in Pennsylvania.

In order to state a cause of action for market share alternate liability, according to the Supreme Court of Washington, a DES plaintiff must allege the following elements:

(1) that the plaintiff's mother took DES; (2) that DES caused the plaintiff's subsequent injuries; (3) that the defendant produced or marketed the type of DES taken by the plaintiff's mother; and (4) that the defendant's conduct in producing or marketing the DES constituted a breach of a legally recognized duty to the plaintiff. *Id.* 102 Wash.2d at 604, 689 P.2d at 382. The *Martin* Court explained the plaintiff's burden of proof as follows:

> ... the plaintiff need not prove that a defendant produced or marketed the precise DES taken by the plaintiff's mother. Rather, *the plaintiff need only establish by a preponderance of the evidence that a defendant produced or marketed the type (e.g., dosage, color, shape, markings, size or other identifiable characteristics) of DES taken by the plaintiff's mother;* the plaintiff need not allege or prove any facts related to the time or geographic distribution of the subject DES.

*Id.* (emphasis added). After the plaintiff has made out a prima facie case, the burden will then shift to the defendants to establish their freedom from liability.

Individual defendants are entitled to exculpate themselves from liability by establishing, by a preponderance of the evidence, that they did not produce or market the particular type [of] DES taken by the plaintiff's mother; that they did not market the DES in the geographic area of the plaintiff mother's obtaining the drug; or that it did not distribute DES in the time period of plaintiff mother's ingestion of the drug.

*Id.*

In the instant case, the defendants, in whose favor summary judgments were entered, established during discovery that they could not be held liable on this theory. They exculpated themselves by facts which appellants accept without dispute. Several defendants showed that they had never manufactured or marketed DES as a miscarriage preventative. Others demonstrated that they had not manufactured DES during the period in which plaintiffs' mothers used the drug. Still others showed that they had never

marketed DES in Pennsylvania. Indeed, not one of the appellee-defendants had marketed DES in Pennsylvania at or about the time of alleged ingestion as a miscarriage preventative in the dosage, color, shape, size or markings used by the plaintiffs or their mothers. Thus, we find it unnecessary to consider the merits of the market share alternative liability concept adopted by the Supreme Court of Washington. Even if such a theory were adopted in Pennsylvania, it would not permit recovery against those defendants who were excused by the trial court in this case.

## II.

The judgment entered in favor of Warren-Teed Pharmaceuticals, Inc. was based on the fact that it had been a successor corporation to Warren-Teed Products Company and had not existed when its predecessor manufactured and sold DES in Pennsylvania. Appellants argue that liability of Warren-Teed Pharmaceuticals, Inc. can be found to exist by application of the "product line exception" to the general rule that a successor corporation is not liable for its predecessor's acts.

"The general rule is that when one company sells or transfers all of its assets to a successor company, the successor does not acquire the liabilities of the transferor corporation merely because of its succession to the transferor's assets." *Dawejko v. Jorgensen Steel Co.,* 290 Pa.Super. 15, 18, 434 A.2d 106, 107 (1981). See also: *Husak v. Berkel Inc.,* 234 Pa.Super. 452, 456, 341 A.2d 174, 176 (1975). To this general rule this Court, in *Dawejko v. Jorgensen Steel Co., supra,* adopted the "product line exception" as articulated by the Supreme Court of New Jersey in *Ramirez v. Amsted Industries, Inc.,* 86 N.J. 332, 431 A.2d 811 (1981):

[W]here one corporation acquires all or substantially all the manufacturing assets of another corporation, even if exclusively for cash, *and undertakes essentially the same manufacturing operation as the selling corporation,* the purchasing corporation is strictly liable for

injuries caused by defects in units *of the same product line,* even if previously manufactured and distributed by the selling corporation or its predecessor.

*Id.* at 358, 431 A.2d at 825 (emphasis added). See: *Dawejko v. Jorgensen Steel Co., supra* 290 Pa.Super. at 23, 434 A.2d at 110–111. See also: *Amader v. Pittsburgh Corning Corp.,* 546 F.Supp. 1033, 1036 (E.D.Pa.1982).

■ Warren-Teed Pharmaceuticals, Inc. was organized in 1963 as a wholly owned subsidiary of Rohm and Haas Company. It acquired the assets of Warren-Teed Products Company, which had existed as an independent corporate entity prior to July 19, 1963. The Corporate Secretary of Rohm and Haas Company demonstrated by affidavit that Warren-Teed Pharmaceuticals, Inc. had *never* manufactured, promoted or marketed DES at any time in its history. Appellants have not challenged this fact. Indeed, the record suggests an absence of any dispute that Warren-Teed Pharmaceuticals, Inc. has *not* "undertaken essentially the same manufacturing operation" as its predecessor, Warren-Teed Products Company. The new corporation did not continue to manufacture or distribute DES as its predecessor allegedly had done. Since plaintiffs' mothers and Mrs. Stark all had discontinued usage of DES long before 1963, and since Warren-Teed Pharmaceuticals, Inc. did not continue the allegedly defective product line maintained by its predecessor, Warren-Teed Pharmaceuticals, Inc. cannot be liable for the injuries of any appellant. The product line exception does not apply.

## III.

The summary judgment entered in favor of all defendant-manufacturers of DES and dismissing the claims of Ann S. Lynch and Michael P. Lynch was premised upon a two year statute of limitations applicable to causes of action for personal injuries. See: 42 Pa.C.S. § 5524.[4] The court

4. If the claim of Ann Lynch is barred by the statute of limitations, the claim of her husband for loss of consortium is barred as well.

found that Ann Lynch, as a matter of law, either knew or should have known that her injury had been caused by her mother's ingestion of DES more than two years before her action was commenced. Therefore, her cause of action was dismissed.

Pennsylvania courts, in an effort to ameliorate the sometimes harsh effect of the statute of limitations have adopted what has come to be known as the "discovery rule." See: *Anthony v. Koppers Co.*, 284 Pa.Super. 81, 425 A.2d 428, *rev'd on other grounds*, 496 Pa. 119, 436 A.2d 181 (1981). "Where this rule is applied, the statute of limitations will not begin to run until the plaintiff has discovered his injury, or, in the exercise of reasonable diligence, should have discovered his injury." *Cathcart v. Keene Industrial Insulation*, 324 Pa.Super. 123, 135–136, 471 A.2d 493, 500 (1984). See also: *Schaffer v. Larzelere*, 410 Pa. 402, 189 A.2d 267 (1963); *Gravinese v. Johns-Manville Corp.*, 324 Pa.Super. 432, 438, 471 A.2d 1233, 1236 (1984). "[T]he statute of limitations begins to run in 'creeping disease' cases when the plaintiff knows, or reasonably should know: (1) that he has been injured, and (2) that his injury has been caused by another party's conduct." *Cathcart v. Keene Industrial Insulation, supra* 324 Pa.Super. at 136–137, 471 A.2d at 500 (footnote omitted).[5] The plaintiff, however, need not know that he has a cause of action before the statute of limitations begins to run. *Berardi v. Johns-Manville Corp.*, 334 Pa.Super. 36, 43, 482 A.2d 1067, 1071 (1984). "[O]nce [a plaintiff] possesses the salient facts concerning the occurrence of his injury and *who* or *what* caused it, he has the ability to investigate and pursue his claim." *Id.*, 334 Pa.Superior Ct. at 44, 482 A.2d at 1071 (emphasis in original; citation omitted), quoting *Staiano v. Johns Man-*

*Staiano v. Johns Manville Corp.*, 304 Pa.Super. 280, 284, 450 A.2d 681, 682 (1982).

**5.** The Supreme Court's recent opinion in *Pocono International Raceway v. Pocono Produce, Inc.*, 503 Pa. 80, 468 A.2d 468 (1983), effected no change in the application of the "discovery rule" in "creeping disease" cases. See: *Powell v. Johns-Manville Corp.*, 342 Pa.Super. 544, 549, 493 A.2d 724, 727 (1985).

*ville Corp., supra* 304 Pa.Super. at 288, 450 A.2d at 685 (1982). See also: *Price v. Johns-Manville Corp.,* 336 Pa. Super. 133, 139, 485 A.2d 466, 469 (1984).

What is or is not reasonable diligence under the circumstances of a particular case requires an evaluation of the plaintiffs' actions to determine whether he or she exhibited "those qualities of attention, knowledge, intelligence and judgment which society requires of its members for the protection of their own interests and the interests of others." *Petri v. Smith,* 307 Pa.Super. 261, 271, 453 A.2d 342, 347 (1982), quoting Restatement (Second) of Torts § 283, comment b. "The standard of reasonable diligence is an objective or external one that is the same for all individuals. It is not a subjective standard. It is a community standard. It is sufficiently flexible, however, to take into account difference[s] between persons, their capacity to meet certain situations and the circumstances confronting them at the time in question." *Petri v. Smith, supra,* 307 Pa.Superior Ct. at 271–272, 453 A.2d at 347. We evaluate the plaintiff's conduct in terms of what he should have known at a particular time by following a course of reasonable diligence. If a party has the means of discovery within his power but neglects to use them, his claim will still be barred. *De Martino v. Albert Einstein Medical Center N.D.,.* 313 Pa.Super. 492, 508, 460 A.2d 295, 303 (1983). However, where the issue involves a factual determination regarding what is a reasonable period of time for a plaintiff to discover his injury and its cause, the determination is for the jury. Cf. *Smith v. Bell Telephone Co.,* 397 Pa. 134, 142, 153 A.2d 477, 481 (1959). Only where the facts are undisputed and lead unerringly to the conclusion that the length of time it took the plaintiff to discover the injury or its cause was unreasonable may the question be decided as a matter of law on summary judgment. *Anthony v. Koppers Co., supra* 284 Pa.Super. at 110–111, 425 A.2d at 443.

In August, 1979, Ann Lynch was told by Dr. Thomas Allen, an obstetrician-gynecologist, that she had a cervical stenosis. This condition manifested itself in a tightness of

the cervical opening which caused her to experience severe menstrual cramps, aggravated by scar tissue which had formed from the surgical removal of a polyp in 1974. Also in August, 1979, Ms. Lynch was told by her mother, Elizabeth Semes, that the mother may have taken DES while pregnant with Ann in 1953. Mrs. Semes further informed her daughter that she had seen a television program in which a woman had described how she became "really sick" because her mother had taken DES while pregnant. Ms. Lynch then telephoned her mother's obstetrician, Dr. John H. Boal, who confirmed that DES had been prescribed for Mrs. Semes. Nevertheless, Dr. Boal assured Ann Lynch that there was no need to worry. Ann Lynch also asked Dr. Allen whether her cervical stenosis, the polyp removed in 1974, and her menstrual cramps could have been related to her mother's ingestion of DES. Dr. Allen told her that the physical difficulties which she had experienced were not related to her mother's ingestion of DES. On November 13, 1979, Ms. Lynch met with Dr. Allen for a post-operative visit, when Dr. Allen again told her that there was no need to worry. He told her that many people who had never been exposed to DES also contracted cervical stenosis. Although Ms. Lynch was still concerned about possible future health problems, she testified in her depositions that she had relied upon the opinions of Dr. Boal and Dr. Allen and had made no further inquiry because she was experiencing no pain.

Three months later, in February, 1980, Ms. Lynch watched a local television show which contained a discussion of DES related health problems. One problem named was the occurrence of abnormal skin growths. The television program referred persons with questions about DES to local health clinics. Recalling the polyp which she had had removed six years earlier, Ms. Lynch contacted the Pittsburgh Free Clinic, one of the health centers recommended by the program. She talked with Paul Puntari, a medical social worker, who suggested to her that her problem might well have been DES related. He advised her to

undergo a colposcopy. Thereafter, she contacted Dr. Allen, whose associate performed colposcopies, but was told that the procedure was unnecessary. Nevertheless, Puntari insisted that her problems were probably DES related and that a colposcopy should be done. Ms. Lynch had been impressed by Puntari's knowledge about DES and, at his suggestion, sought legal advice. Finally, in March, 1982, after a civil action had been commenced, she had a colposcopy performed. The operation revealed a hypoplastic (undersized) uterus and ovaries. Ms. Lynch was advised that any pregnancy would be "high risk" and that there existed an increased possibility that she would develop cancer.

The trial court held as a matter of law that Ms. Lynch knew, or reasonably should have known by September or November of 1979, more than two years prior to the initiation of her action on January 19, 1982, that her abnormalities were DES related. Appellants argue, however, that Ms. Lynch reasonably could not have known that a causal connection existed prior to February of 1980. Only after viewing the television program and consulting with Puntari, Ms. Lynch contends, did she become aware that her condition might be DES related. We agree.

■■ Undoubtedly, the plaintiff was aware of her physical abnormalities prior to September, 1979. It is not clear, however, that she knew or had reason to know that they had been caused by the DES which had been ingested by her mother. Two physicians had told her that neither the polyp nor the cervical stenosis had been caused by the DES. Under these circumstances, the application of the statute of limitations was for the jury. Whether the plaintiff acted reasonably when she decided to forego immediate, additional investigation or professional consultation after having been reassured in November, 1979 that her condition was not DES related was an issue of fact.

The appellee drug companies argue that summary judgment was supported by the decision of the Court of Appeals for the Third Circuit in *O'Brien v. Eli Lilly & Co.*, 668 F.2d 704 (3d Cir.1981). There, the Court, applying Pennsylvania

law, affirmed the entry of summary judgment in favor of all defendants against an alleged victim of DES. Ms. O'Brien had been told by her doctor in 1976 that her type of cancer "pointed to" DES causation. *Id.* at 708. She had also read an article in *Newsweek* in which the link between cancer and DES had been discussed. However, when her mother denied ever having taken DES, Ms. O'Brien made no further inquiry. It was not until three years later that O'Brien contacted her mother's obstetrician and discovered that DES had been prescribed for her mother. The Court held as a matter of law that O'Brien had unreasonably relied upon her mother's advice and should have contacted the obstetrician, whose identity she knew in 1976, immediately after being advised that DES may have caused her cancer.

These facts are readily distinguishable from the facts of the instant case. The missing information as to the cause of Ann Lynch's condition could not have been acquired by a telephone call. Appellant already knew that her mother had taken DES. The hiatus in Ms. Lynch's knowledge was created by opinions of two physicians who told her that her medical problems were not related to the ingestion of DES by her mother. Ms. O'Brien's doctor, by contrast, had informed her that her injuries possibly were linked to DES.

The factual circumstances in *Barshady v. Schlosser*, 226 Pa.Super. 260, 313 A.2d 296 (1973) are analagous to the facts in the instant case. In April of 1961, Barshady underwent surgery to cure a disease of her middle ear. Immediately after the operation, she complained of pain and numbness in various parts of her face. The defendant-surgeon assured her that the pain was caused by an emotional reaction to the surgery, and that it was only temporary. She continued to obtain treatment from the defendant-physician for several years. During this time, the defendant reassured her that the pain was temporary. He did so as late as March of 1963, nearly two years after the operation had taken place. When the symptoms failed to subside, the plaintiff consulted another physician. He informed her that

a nerve in her ear had been damaged. On February 9, 1965, the plaintiff instituted a medical malpractice action against the defendant-physician. At trial, the defendant moved for a nonsuit on the ground that the two year statute of limitations barred recovery. The trial court granted the motion. On appeal, the trial court was affirmed by an equally divided Superior Court.

In an opinion in support of reversal, Judge Hoffman articulated the discovery rule and concluded that the plaintiff's delay in bringing suit had not been unreasonable in light of the circumstances:

> The appellant confronted her surgeon with her symptoms and ailments immediately after the operation. Having absolute confidence in the judgment of her physician, as is the case in many physician-patient relationships, she believed the appellee's statement that the pain was an emotional reaction to surgery and the numbness would be temporary. So confident was she, that despite the ongoing nature of her symptoms appellant continued her treatments with the appellee until March, 1963. We believe that appellant's delay in seeking other medical advice was a reasonable one, prompted by her faith in her physician.
>
> . . . .
>
> During the two years following surgery, the appellant who had been under the continuous treatment of the appellee could not reasonably have been expected to ascertain the cause of her symptomology. Instead, she could only conclude, based on the appellee's assurances, that her maladies were temporary and would disappear with time.
>
> While the appellant was symptomatic since 1961, and while physical examination would have determined the extent of injury as early as 1961, to compute the running of the statute of limitations from that date simply is not the law. Because of appellant's reasonable reliance on appellee's representations, we conclude that the statute was tolled until March, 1963, at which time appellant was first able to ascertain the cause of her injury. *Ayers v.*

*Morgan,* supra. In our opinion that was the crucial factor. Logic and judicial fairness compel no other result.

*Barshady v. Schlosser, supra,* 226 Pa.Superior Ct. at 264–265, 313 A.2d at 298, 299. We adopt this reasoning and apply it to the facts of the instant case.

It cannot be said as a matter of law that Lynch's acceptance of the opinions of two trusted physicians was unreasonable. In the face of these expert opinions, she could not be expected to know, or so a jury could find, that her physical difficulties were related to the DES which had been ingested by her mother. See also: *De Martino v. Albert Einstein Medical Center, N.D., supra* 313 Pa.Super. at 504, 460 A.2d at 301. Cf. *Petri v. Smith, supra* (in medical malpractice action, held that plaintiff was not unreasonable in failing to seek cause of her newborn son's retardation where her physicians had informed her that "these things happen" and that it was a one time thing that probably would never happen again). We conclude, therefore, that it was error to hold as a matter of law that the Lynch claim was barred by the statute of limitations.

The orders granting summary judgments and appealed from at Nos. 589, 590, 591, 592, 593 Pittsburgh, 1984 are affirmed. The order granting summary judgment against Ann Lynch and Michael Lynch and in favor of all remaining defendants (appeal docketed at No. 594 Pittsburgh, 1984) is reversed, and that claim is remanded for further proceedings not inconsistent with this opinion. Jurisdiction is not retained.

DEL SOLE, J., files a concurring and dissenting Statement.

DEL SOLE, Judge, concurring and dissenting:

I join the Majority Opinion in all respects except its reversal of the summary judgment entered in favor of all defendant manufacturers of DES dismissing the claims of Ann S. Lynch and Michael P. Lynch. It is obvious that the

plaintiff possessed the salient facts concerning her injury namely who and what caused same. I do not believe that the statute of limitations and its application should depend upon the quality of any subsequent inquiry or improper information that may be given when such inquiry is made. Consequently, I would affirm the opinion of the trial court on this issue.